UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------X
                                                :
CJ PRODUCTS, ET AL                              :
                                                :
Plaintiffs                                      :
                                                :
            v.                                  :         Civ Action No. 10 CV-05878 (RJH)
                                                :
TOY GALAXY, ET AL.                              :         JOINT FINAL PRE-TRIAL ORDER
                                                :
Defendants                                      :
                                                :
-------------------------------------------------X

        The following shall constitute the Final Pretrial Order pursuant to Rule 16,

Federal Rules of Civil Procedure. This Final Pretrial Order shall govern the conduct of

the trial of this case.  Amendments to this Order will be allowed only in exceptional

circumstances to prevent manifest injustice.  See Fed. R. Civ. P. 16(e).  Counsel are

urged to move to amend in a timely fashion any portion of the Order that must be

changed or modified between the filing of the Order and the trial date.

1.      **FULL CAPTION**

CJ Products LLC and Ontel Products Corp. v. BTC Enterprises LLC dba Toy Galaxy and
Recai Sakar,

BTC Enterprises LLC dba Toy Galaxy v. CJ Products LLC, Ontel Products Corp. and
Epstein Drangel, LLP  (counterclaims)

Docket  No. 10- cv-5878 (RJH).

2.      **APPEARANCES**

        *Attorneys for Plaintiff*

        Jason Drangel, Esq.

EPSTEIN DRANGEL LLP
60 East 42nd Street, Suite 2410
New York, New York 10165
Telephone: (212) 292-5390
Fax: (212) 292-5391

*Attorney for Defendants*

Kelly D. Talcott, Esq.
Law Offices of Kelly D. Talcott
34 Grove Street, P.O. Box 43
Sea Cliff, NY 11579-0043
Telephone: 516.515.1545
Fax: 516.871.0682

3.     **SUBJECT MATTER JURISDICTION**

This Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. § 1331, insofar as it raises questions under the laws and treaties of the United States and under 28 U.S.C. § 1338 insofar as it raises questions under copyright.

4.     **PLAINTIFF'S CLAIMS**

A.     **Remaining To Be Tried**.

Plaintiffs have prevailed on their copyright infringement claims against the Defendants. Defendants are jointly and severally liable.  Plaintiffs now seek a trial to determine damages.  Plaintiff must prove damages by a preponderance of evidence.  A prevailing plaintiff is entitled to recover his actual damages plus the defendant's profits, or "statutory" damages. See 17 U.S.C. § 504(a & b) (actual damages and profits); id. § 504(c) (statutory damages). Though plaintiffs typically elect between these two forms of recovery before the jury is instructed, the statute permits a plaintiff to elect statutory damages "at any time before final judgment is rendered." Id. § 504(c).

B.     **Claims Previously Asserted.**

Plaintiffs have withdrawn the following claims:  trademark infringement, false designation of origin, unfair competition, dilution and trade dress infringement under the Lanham Act (15 U.S.C. §1051 et seq.); Gen. Bus. Law §§ 349, 350, New York Unfair Competition and Unjust Enrichment.

Plaintiffs and Counterclaim Defendant Epstein Drangel, LLP were granted summary judgment on all counter-claims.  Defendants have no remaining claims to pursue.

C.     **Defendants' Defenses.**[1]

Recai Sakar did not act in anything other than his capacity as an officer or employee of defendant Toy Galaxy, such that all claims against him personally should be dismissed.

Foldable plush animals similar to or the same as Plaintiffs' "Pillow Pets" products were and are  widely available from suppliers and were and are sold in the United States under names other than "Pillow Pets."  Some of the parties presently selling such products in the United States are ones against which Plaintiffs prosecuted earlier lawsuits.

Defendant Toy Galaxy consistently made efforts to distinguish its products from Plaintiffs', both by registering for and using its own trademark "Smooshie Pets" for its foldable plush animals, and by taking affirmative steps not to casually refer to its products as "pillow pets."

Other than through the Toy Galaxy website, Defendants did not own, control, or operate any of the retail establishments that sold its foldable stuffed animal products.

---

[1]     Plaintiffs object to nearly all of Defendants' proposed defenses on the grounds of relevance.  The issues of ownership and authorship have been adjudicated.  Accordingly, any mention of issues, facts or documents that relate to CJ Products' ownership or authorship should not be permitted.  Defendants contend that these defenses relate directly to the issue of willfulness, which remains very much at issue.

Defendants similarly did not control what its customers called their retail establishments, or the manner in which its customers advertised or referred to its foldable plush animal products.

Until December 2011, and despite Defendants' timely request in discovery, Plaintiffs did not provide Defendants with copies of the deposit materials submitted to the United States Copyright Office in connection with the registrations that the Court found were infringed. Defendants thus had reasonable grounds upon which to question the nature and extent of what designs were registered by Plaintiffs.

There were numerous legitimate questions concerning the extent to which Plaintiffs were responsible for the creation of the registered designs, including a lack of any assignment of rights from CJ Product's principal to the entity CJ Products LLC, and an after-the-fact assignment of design rights from Plaintiffs' manufacturer to CJ Products LLC that was made as of a date when plaintiff CJ Products did not yet exist.

5.    **JURY TRIAL**

Plaintiffs and Defendants agree that this case is to be tried by a jury and we anticipate that between one to three trial days are needed.

6.    **MAGISTRATE**

The parties do not agree to proceed before a Magistrate.

7.    **STIPULATIONS OF FACT AND LAW**

   A.    **Stipulation of Facts.**

      1. CJ is a gift and toy company involved in, among other things, the development, production, sale, and distribution of gift and toy products. One of the main components of CJ's business encompasses the production, sale and distribution of its distinctive PILLOW PETS®, MY PILLOW PETS®, PILLOW PETSTM, IT'S A PILLOW, IT'S A PET, IT'S A PILLOWPET®   trademarks (cumulatively

referred hereinafter as "Marks") that are applied to a combination of a stuffed animal and functional pillow product ("Pillow Pets Product").

2. CJ owns numerous United States Copyright Registrations relating to its Product three dimensional designs, including the following:

Lady Bug
Bumble Bee
Turtle
Penguin
Duck
Cow
Frog
Horse
Unicorn
Moose
Dog

3. The Pillow Pets Products have achieved great success since their introduction in 2004. The success of the Pillow Pets Product is due in part to CJ's marketing and promotional efforts These efforts include advertising and promotion through CJ's websites, television publicity, print and other internet-based advertising.

4. CJ has spent substantial time, money and effort in building up and developing consumer recognition, awareness and goodwill in its Marks and Pillow Pets Products.

5. The success of CJ's Pillow Pets Products, and other related products and services is not due to CJ's promotional efforts alone.

6. In the United States, no one other than CJ and it exclusive licensee Ontel are authorized to manufacture, advertise, offer for sale or sell any goods utilizing the Product IP without the express written permission of CJ.

7. In 2010, Ontel began to sell the Pillow Pets Products to its mass market customers.

8. Defendants have been involved in the toy business since 2002.

9. Defendant Sakar makes all purchase, sale and marketing decisions for Defendant Toy Galaxy.

10. Defendant Sakar is responsible for all financial and customer service work for Defendant Toy Galaxy.

11. Over the years, Defendants have sold plush toys, battery operated toys and radio controlled vehicles, like cars, and helicopters.

12. When Defendants first entered the toy business (between 2002 and 2004), Defendants owned mall kiosks in Long Island, N.Y. and suburban Pennsylvania in order to sell toys.

13. Defendants left the mall kiosk business because there was too much competition; it was difficult to get good employees to run the kiosks; difficult to find good mall kiosk locations; and the rents were too high.

14. According to Defendants, the mall kiosk business is seasonal.

15. Defendant Sakar considers himself "pretty much familiar" with the mall kiosk business.

16. Mr. Sakar testified that through 2007, his customers were "[m]ostly like flea market operators and kiosk operators."

17. Between 2005 and 2009, Defendants have averaged between ten (10) and (25) mall kiosk owner customers at any time, some with multiple kiosk locations.

18. Nearly all of Defendants' kiosk customers are located in the Northeast.

19. Kiosk owners typically buy goods from multiple sources.

20. Defendants began to engage in the wholesale distribution of toys somewhere around 2003-2004.

21. Defendants began to import toys directly from China beginning in 2004. The first products Sakar imported were remote control vehicles.

22. Defendants first discovered remote control toy products from China using Alibaba.com.

23. Through 2009, Defendants most successful products were remote controlled helicopters.

24. Through 2009, the principal plush products sold by Defendants were pillow/cushions shaped like flowers, some were animal shaped and others had animal designs.

25. The pillow/cushion products were not foldable animal-shaped pillows.

26. Defendant Sakar attended the New York Toy Show at the Jacob Javitz Center in 2003, 2007 and 2010.

27. Defendants determine what products to sell by speaking with customers and friends.

28. Defendant would then research the products on the Internet.

29. Defendants research regarding a foldable animal-shaped pillows in early 2009 originated from a customer named Omer Korkmaz.

30. After conducting research on Alibaba.com, beginning in March 2009 Defendants purchased sample foldable animal-shaped pillows from two (2) Chinese trading companies.

31. The initial samples were pre-existing designs.

32. Defendants believed the trading companies had the following foldable animal-shaped pillow designs available in 2009: a Dog, Panda, Lion, Turtle, Cow, Unicorn, Dragon, Poodle.

33. Defendants had seen many companies offering the same or similar foldable animal-shaped pillows designs on Alibaba.com.

34. Defendants purchased foldable animal-shaped pillows from one of the two trading companies it purchased samples from called Peaceful Cheers.

35. Defendants had never met or worked with Peaceful Cheers. Defendants did not video chat or e-mail with Peaceful Cheers. They communicated by Skype voice calls only.

36. Defendants recall receiving the following samples from Peaceful Cheers in 2009: Dog, Panda, Turtle, Duck and Cow.

37. Peaceful Cheers did not manufacture the products. Peaceful Cheers purchased the foldable animal-shaped pillows from Chinese factories.

38. Peaceful Cheers would not disclose the source of the manufacturers for the foldable animal-shaped pillows.

39. The foldable animal-shaped pillows designs at issue were allegedly designed by Mr. Kam Tat of Peaceful Cheers.

40. Defendants placed initial orders for the foldable animal-shaped pillows in August/September, 2009.

41. Defendants' foldable animal-shaped pillows were called Smooshie Pets.

42. Defendants' SMOOSHIE PETS Lady Bug, Bumble Bee, Turtle, Penguin, Duck, Cow, Frog, Horse, Unicorn, Moose and Dog were found to infringe on Plaintiff CJ's copyrighted PILLOW PETS Lady Bug, Bumble Bee, Turtle, Penguin, Duck, Cow, Frog, Horse, Unicorn, Moose and Dog. Photographs of Plaintiffs Pillow Pets and Defendants Smooshie Pets are shown in a side by side comparison (Plaintiffs Pillow Pet is on the left in each photo).

43. Defendant Sakar could not tell which products were his company's from low-quality photos of the carts that were taken from approximately 25 feet away.

44. A warning letter was sent to Defendants on October 21, 2009 but Defendant did not respond.

45. Defendants indicate that it was not until receiving a warning letter in October, 2009 that Defendants were made aware of Plaintiffs alleged rights.

46. Defendants asked multiple Chinese sources of foldable plush animals if there were copyright issues and were told no.

47. Defendants discussed the October, 2009 warning letter with Peaceful Cheers who indicated that "they are making own designs" and they owned the rights.

48. Defendant Sakar indicated that after receiving the warning letter in October, 2009 he checked to see if the Smooshie Pets designs were similar to Pillow Pets designs on the mypillowpets.com website.

49. Defendant believed the designs were different and "just figured that they couldn't own a panda, you know, or a cow."

50. Defendants did not check with an attorney to see if there was an issue with selling the Smooshie Pets designs.

51. Defendants sold Smooshie Pets to a number of kiosk owners who designated their kiosks as "My Pillow Pets" and "Pillow Pets".

52. Defendants indicated that the most sales of Smooshie Pets occurred between end of first quarter 2010 through the beginning of Christmas holiday season 2010.

53. Defendants gained new customers as a result of selling Smooshie Pets.

54. Defendants have sold the following number of units of SMOOSHIE PETS wholesale and retail:

|  | Wholesale | Retail (Internet Sales) |
|---|---|---|
| Lady Bug |  |  |
| Bumble Bee |  |  |
| Turtle |  |  |
| Penguin |  |  |
| Duck |  |  |
| Cow |  |  |
| Frog |  |  |
| Horse |  |  |
| Unicorn |  |  |
| Moose |  |  |
| Dog |  |  |

55. Defendants purchased SMOOSHIE PETS for $4.15 per medium unit and $5.50 per large unit.

56. Defendants sold SMOOSHIE PETS for $7.50 unit wholesale.

57. Defendants sold SMOOSHIE PETS for approximately $19.99 unit retail (kiosk and Internet).

58. None of the designs at issue sold by defendant BTC are counterfeit products. Fried Dep. 44:11-15.

59. The following eight copyright registrations at issue claim a "Date of 1st Publication" date that is before the March 21, 2008 date that the California Secretary of State designates as the date on which CJ Products LLC was formed: VA0001674373 (11/30/04) (Dog); VA0001674372 (11/30/04) (Frog); VA0001674371 (3/30/07) (Penguin); VA0001679221 (3/31/07) (Turtle); VA0001715272 (11/1/04) (Cow); VA0001715275 (11/1/04) (Duck); VA0001715250 (3/1/08) (Horse); and VA0001665418 (1/30/08) (Bumblebee or Lady

Bug). The other three copyright registrations at issue claim a "Date of 1st Publication" after March 21, 2008. Wright Decl. Exh. B.[2]

60. Each of the copyright registrations at issue was filed in the name of CJ Products LLC. Wright Decl. Exh. B.

61. Telfer did not assign any designs she created prior to March 21, 2008, including those listed in paragraph 5 above, to CJ. Talcott Decl. para. 7 and Exh. 4 at Request no. 43.

62. CJ Products LLC entered into an agreement with its supplier, Color Rich Limited (or "CRL"), titled "Work for Hire, Nunc Pro Tunc Assignment of Copyright and Waiver of Other Rights Agreement" (the "Nunc Pro Tunc Agreement"). The Nunc Pro Tunc Agreement stated that it was "effective, nunc pro tunc as of 2004." The Nunc Pro Tunc Agreement was dated April 26, 2011. CJ Products LLC and Color Rich Limited were the only two parties to the Nunc Pro Tunc Agreement. Talcott Decl. para. 8 and Exh. 5.

63. The Nunc Pro Tunc Agreement purports to "confirm in writing the oral agreement and understanding between the parties as of 2004 that all United States right, title and interest in and to the Pillow Pets products identified in Exhibit A hereto, and other Pillow Pets products now known or later developed by and between the Parties ('Pillow Pets Works'), were, are and shall be works made for hire and and/or to the extent not legally works for hire, as of 2004, CRL agreed to assign to CJ, and did assign to CJ, all U.S. right, title and interest in and to the Pillow Pets Works." "CJ" is a defined term in the Nunc Pro Tunc Agreement, and refers specifically to "CJ Products LLC." Talcott Decl. para. 8 and Exh. 5 at 1.

64. Exhibit A to the Nunc Pro Tunc Agreement lists certain designs that it purports to cover. The designs are listed by name only, and do not include any cross-reference to any copyright registration or image. The list does not include the name "Unicorn," which is the name of one of the designs at issue in this motion. Talcott Decl. para. 8 and Exh. 5 at Exhibit A.

65. CJ Products LLC did not exist before March 21, 2008. Talcott Decl. Exh. 2.

---

[2] Plaintiff objects to the inclusion of Stipulated Facts 59-69 since the ownership and authorship issues have been adjudicated and are not relevant to damages issue. Accordingly, any mention of alleged facts that relate to CJ Products' ownership or authorship should not be permitted. Defendants contend that these alleged facts relate directly to the issue of willfulness, which remains very much at issue.

66. In the Nunc Pro Tunc Agreement Color Rich Limited (or "CRL") "represents and warrants to CJ" that "CRL has authored the Pillow Pets Works, in cooperation with CJ and one or more employees of CRL, working in their capacity as employees of CRL, and no person or persons other than the above participated in such authorship." Talcott Decl. para. 8 and Exh. 5 p. 3 at 5.a.

67. CRL contributed to the designs of the products listed in the Nunc Pro Tunc Agreement.  Talcott Decl. Para. 17 and Exh. 13 Telfer Dep. 33: 2-5.

68. Until December of 2011, Plaintiffs did not provide to Defendants copies of the deposit materials submitted to the United States Copyright Office in connection with the application for registration of any of the copyright registrations at issue.

69. Defendant Recai Sakar has in all matters related to BTC Enterprises LLC's design, purchase, marketing, and sale of foldable plush animals acted solely as a member of BTC, working on BTC's behalf, in furtherance of BTC's business.  Sakar Decl. paras. 1-8.


**B.**     **Stipulations of Law.**

1. Plaintiff must prove damages by a preponderance of evidence.
2. A prevailing plaintiff is entitled to recover his actual damages plus the defendant's profits, or "statutory" damages. See 17 U.S.C. § 504(a) & b) (actual damages and profits); id. § 504(c) (statutory damages).
3. Though plaintiffs typically elect between these two forms of recovery before the jury is instructed, the statute permits a plaintiff to elect statutory damages "at any time before final judgment is rendered." Id. § 504(c).
4. Examples of actual losses from copyright infringement include:
   a. - A decrease in the market value of the copyrighted work caused by   the infringement.
   b. - Profits that Plaintiff proves he would have made without the infringement. To recover lost profits, the copyright owner must prove the quantity of sales he would have made absent the infringement, as well as the profits he would have earned on those sales, which consists of the revenue the copyright owner would have made, less any the additional expenses he would have incurred in making the sales. Taylor v. Meirick, 712 F.2d 1112, 1120-1121 (7th Cir. 1983).
   c. - What a willing buyer reasonably would have paid Plaintiff to obtain a license to Plaintiff's copyrighted work.

5. In addition to recovering for his actual losses, Plaintiff is entitled to recover the profits that Defendant made because of the infringement. Defendant's profits are recoverable, however, only to the extent that you have not taken them into account in determining Plaintiff's actual losses. Defendant's profits are revenues that Defendant made because of the infringement, minus Defendant's expenses in producing; distributing; marketing; selling the product. Plaintiff need only prove Defendant's revenues. Defendant must prove his own expenses [and any portion of his profits that resulted from factors other than infringement of Plaintiff's copyright]. See 17 U.S.C. §504(b).

6. The rationale for allowing the copyright owner to recover the infringer's profits in addition to the owner's actual losses is that it prevents the infringer from keeping "windfall" profits that he made from his decision to infringe the copyright rather than to negotiate with the copyright owner for a license. See Taylor v. Meirick, 712 F.2d 1112, 1120 (7th Cir. 1983); Bucklew v. Hawkins, Ash, Baptie & Co., 329 F.3d 923, 931(7th Cir. 2003).

7. A plaintiff may obtain statutory damages in lieu of actual damages and profits. A statutory damages award must be fair under the circumstances. The amount must be between $750 and $30,000 for each copyrighted work found to be infringed. Under 17 U.S.C. § 504(c).

8. If Plaintiff proves that Defendant willfully infringed Plaintiff's copyright, then statutory damage award may be increased to a sum as high as $150,000 per copyrighted work. Infringement is considered willful if Plaintiff proves that Defendant knew that his actions constituted infringement of Plaintiff's copyright or acted with reckless disregard of Plaintiff's copyright.

9. Plaintiff's damages and/or defendant's profits are among the factors to be considered when setting statutory damages, since "[s]tatutory damages are not intended to provide a plaintiff with a windfall recovery." National Football League v. Primetime 24 Joint Venture, 131 F.Supp.2d 458, 478 n.17 (S.D.N.Y. 2001), quoting from Peer Int'l Corp. v. Luna Records, Inc., 887 F.Supp. 560, 569 (S.D.N.Y. 1995).

10. You may not find that Defendant was an innocent infringer if a notice of copyright appeared in the correct form and position on the published copies of Plaintiff's work to which Defendant had access. See 17 U.S.C. § 401.

11. If Defendant proves that he innocently infringed Plaintiff's copyright, then the statutory damage award can be a sum as low as $200 per copyrighted work. Infringement is considered innocent if Defendant proves that he did not know, and had no reason to know, that his acts constituted infringement. See Video Views, Inc. v. Studio 21, Ltd., 925 F.2d 1010, 1020 (7th Cir. 1991) (infringement is willful if infringer knew its conduct was an infringement or acted in reckless disregard of copyright owner's right); 17 U.S.C. § 504(c)(2) (if

infringer proves it was unaware and had no reason to believe its acts
constituted copyright infringement, award may be reduced to $200). In
determining the appropriate amount to award, you may consider the
following factors:
- the expenses that Defendant saved and the profits that he earned
because of the infringement;
- the revenues that Plaintiff lost because of the infringement;
- the difficulty of proving Plaintiff's actual damages;
- the circumstances of the infringement;
- whether Defendant intentionally infringed Plaintiff's copyright;
and
- deterrence of future infringement.

F.W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 233 (1952) (deterrence
of future infringement); Chi-Boy Music v. Charlie Club, Inc., 930 F.2d 1224, 1229 (7th
Cir. 1991) (difficulty or impossibility of proving actual damages; circumstances of
infringement; efficacy of the damages as a deterrent to future infringement); N.A.S.
Import Corp. v. Chenson Enters., Inc., 968 F.2d 250, 252 (2d Cir. 1992) (expenses saved
and profits gained by infringer; revenue lost by copyright holder; state of mind of
infringer; citing 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 14.04[B], at 14-41
(1991)).

8.   **FACT AND EXPERT WITNESSES**

A.   **Plaintiffs' Fact and Expert Witness.**

Plaintiffs will call Jason Biziak (Plaintiff Ontel), Jennifer Telfer (Plaintiff CJ) and

Brian Wright (Plaintiff CJ) as witnesses to testify as to the damages incurred as a result of

Defendants' infringement.   The total testimony by one or more of the three deponents

should take no longer than one (1) day.   Defendant Recai Sakar will also be called to testify

as to Defendants' Infringement, willfulness of the infringement, and damages incurred as a

result of Defendants' infringement.   His testimony (preferably in-person by subpoena or by

cross examination – if not by deposition video testimony) will take no more than one (1)

day.   Plaintiffs have no expert witnesses.

B.    **Defendants' Fact and Expert Witness.**

Defendants will call Recai Sakar to testify as to Defendants' efforts to determine the extent to which Plaintiffs had rights in and to the registered designs; Defendants' efforts to distinguish its products from Plaintiffs'; and costs and expenses associated with sales. Defendants will also call Jennifer Telfer and Brian Wright as witnesses to testify to the origins of the designs at issue; the lack of availability of copyright deposit materials until December 2011; the nunc pro tunc agreement with CJ's manufacturer; the formation of CJ Products LLC; the lack of transfer of rights from Telfer to CJ Products LLC; and the continued sale of foldable plush animals by third parties.  Defendants will also call Jason Biziak of plaintiff Ontel concerning the continuing sales of competing products in the marketplace, and will call Ian Fried of plaintiff Ontel concerning Ontel's determination of the nature of defendant BTC's product sales.

9.    **DEPOSITION TESTIMONY TO BE OFFERED**

A.    Plaintiffs anticipates the use of the following deposition testimony but reserves the right to use other testimony for cross-examination of Mr. Sakar:

See Deposition Transcript of Recai Sakar dated June 2, 2011:

    23:7-9, 12-23
    24: 8-16; 28:2- 31:18
    27:23-25
    28:2-4; 33:4-9
    30:14-17
    32:13-22
    40:16 -44:10;
    48:23 - 49:12.
    49:19-52:5
    52:23-25
    53:8-54:6
    54:4-9
    54:10-55:17

56:13-16
56:5-7
58:8-59:4
60:11-61:22
63:3-6
63:21-65:11
65:12-18
63:21-64:2
65:19-66:4
67:23-78:11
70:11-22, Ex. 4
71:6-15
74:7-75:6
78:11-21
78:22-24
79:9-22
80:21-83:11
83:12-21
83:25-85:1
86:8-15
88:7-25
90:24-91:2
92:5-8, Ex. 5
92:5-8, Ex. 5
93:10-15
85:3-9
91:14-19
98:7-15
91:24-25
116:11-18, Ex. 7
117:12-118:2
136:18-19
135:14-20
78:25-79:22
134:23-25
135:24-136:14
137:3-13
137:17-25
139:9-23
172: 21-25

174:20-175:23
241:6-17
253:24-254:16
293:24-294:10
300:13-16

Defendants deposed Jennifer Telfer and Jason Biziak and reserve the right to use their deposition testimony in connection with their examinations at trial, as well as in connection with the cross-examination of Recai Sakar.  In addition, Plaintiffs reserve the right to use Jennifer Telfer and Jason Biziak deposition testimony in connection with their testimony.

B.      Defendants anticipate the use of the following deposition testimony:

Defendants deposed Jennifer Telfer, Jason Biziak, and Ian Fried, and reserve the right to use their deposition testimony in connection with their examinations at trial, as well as in connection with the cross-examination of Mr. Wright.  In addition, Defendants reserve the right to use Mr. Sakar's deposition testimony in connection with his testimony.

10.    **SCHEDULE LISTING EXHIBITS**

A.      <u>Plaintiffs Exhibits:</u>

| Exhibit No. | Identification | Document Id. | Objection |
|---|---|---|---|
| P-1 | Smooshie Pet Lady Bug | Sakar    Dep., Ex. 22 | Relevance; infringement is no longer at issue.<br><br>Plaintiff believes that the evidence is relevant to show willfulness. |
| P-2 | PP Lady Bug | Sakar    Dep., Ex. 23 | Id. |
| P-3 | Smooshie Bumble Bee | Sakar    Dep., Ex. 20 | Id. |
| P-4 | PP Bumble Bee | | Id. |
| P-5 | Smooshie Cow | Sakar    Dep., Ex. 15 | Id. |
| P-6 | PP Cow | Sakar    Dep., Ex. 16 | Id. |
| P-7 | Smooshie Duck | Sakar    Dep., Ex. 18 | Id. |
| P-8 | PP Duck | | Id. |

| P-9 | Smooshie Turtle | Sakar      Dep., Ex. 27 | Id. |
|---|---|---|---|
| P-10 | PP Turtle | Sakar      Dep., Ex. 28 | Id. |
| P-11 | Smooshie Frog | Sakar      Dep., Ex. 14 | Id. |
| P-12 | PP Frog | Sakar      Dep., Ex. 13 | Id. |
| P-13 | Smooshie Dog | Sakar      Dep., Ex. 29 | Id. |
| P-14 | PP Dog | Sakar      Dep., Ex. 28 | Id. |
| P-15 | Smooshie Horse | Sakar      Dep., Ex. 11 | Id. |
| P-16 | PP Horse | Sakar      Dep., Ex. 12 | Id. |
| P-17 | Smooshie Penguin | | Id. |
| P-18 | PP Penguin | | Id. |
| P-19 | Smooshie Unicorn | | Id. |
| P-20 | PP Unicorn | | Id. |
| P-21 | Smooshie Moose | | Id. |
| P-22 | PP Moose | | Id. |
| P-23** | 10/29/99 Warning Letter | Sakar      Dep., Ex. 4 | |
| P-24** | Purchase Orders | Sakar      Dep., Ex. 5 | |
| P-25** | Design Drawings | Sakar      Dep., Ex. 7 | |
| P-26** | Work for Hire Agreement | Sakar      Dep., Ex. 8 | |
| P-27** | Purchase Invoices & Package Lists | Sakar      Dep., Ex. 9 | |
| P-28** | Sales by Item Summary through 12/2009 and Invoices | Sakar      Dep., Ex. 10, 31-33, 41, 45, 5153 | |
| P-29** | BTC Copyright Registrations and Deposit Materials | Sakar      Dep., Ex. 34 | |
| P-30 | Investigator Report | Sakar      Dep., Ex. 38 | Relevance; hearsay.<br><br>Plaintiff believes it is important to show how Defendants' products |

| | | | |
|---|---|---|---|
| | | | were being sold in the marketplace. |
| P-31 | Cart photos | Sakar Dep., Ex. 42, 44 | Hearsay.<br><br>Plaintiff believes it is important to show how Defendants' products were being sold in the marketplace. |
| P-32 | Pillow Pets Investigation | Sakar Dep., Ex. 48 | Relevance; hearsay.<br><br>Plaintiff believes it is important to show how Defendants' products were being sold in the marketplace. |
| P-33 | CJ Products Vendor Application | Sakar Dep., Ex. 50 | Relevance; hearsay.<br><br>Plaintiff believes it is important to show that Plaintiffs customers were also selling Defendants products. |
| P-34** | Amended Complaint | | |
| P-35** | Amended Answer | | |
| P-36** | Stipulation of Facts | | |
| P-37 | Brian Wright Declarations, I & II | | Relevance; hearsay.<br><br>Plaintiff |

| | | | |
|---|---|---|---|
| | | | believes the declaration may be relevant for cross-examination of Mr. Wright |
| P-38** | Drangel Declarations, I & II | | Relevance; hearsay. Plaintiff believes that exhibits to the declaration may be relevant. |
| P-39** | Sakar Deposition Transcript | | |
| P-40** | Defendant Toy Galaxy's Website Page where ZooPur Pets are being sold as of August 29, 2012: http://www.toygalaxy.net/zoopurrpets.html | | |
| P-41** | Pacer Case Locater – Print –Out of Lawsuits filed by CJ Products / Ontel Products re: PILLOW PETS infringement claims | | |

B.      Defendants' Exhibits:

| Exhibit No. | Identification | Document Id. | Objection |
|---|---|---|---|
| D-1 | CJ Products Business Entity details | Talcott Decl. Exh. 2 | Plaintiffs object on the grounds of relevance. The ownership issue has been adjudicated and is not relevant to the only remaining damage issue. |
| D-2 | Nunc pro tunc agreement | Defendants' Depo. Exh. 26 | Id. |
| D-3 | CJ-Ontel Agreement | Defendants' Depo. Exh. 3 | Id. |
| D-4 | Images of foldable plush animals | | Plaintiff objects to this evidence |

| | presently available for sale from third parties | | since it was not produced during discovery nor at any time to date. The relevance of the proposed materials is also questioned. |
|---|---|---|---|
| D-5** | Plaintiffs' Response to Defendant BTC Enterprises LLC's First Set of Requests for Production of Documents and Things to Plaintiffs | | |
| D-6 | Epstein Drangel letter to kiosk operators | Defendants' Depo. Exh. 8 | This evidence is objected to on the grounds of relevance. The counter-claims related to Epstein Drangel's warning letters have been adjudicated. |
| D-7 | Epstein Drangel letter to mall operators | Defendants' Depo. Exh. 9 | Id. |
| D-8 | Invoices relating to purchases made of products at issue. | | Plaintiff objects to this evidence since it was not produced during discovery nor at any time to date. |
| D-9 | Invoices relating to transport costs to import products at issue. | | Id. |
| D-10 | BTC Warehouse and office lease | | Id. |
| D-11 | BTC records of cmployee wages and benefits | | Id. |
| D-12 | BTC insurance expense records | | Id. |
| D-13 | BTC records relating to customs fees related | | Id. |

| | | | |
|---|---|---|---|
| | to products at issue. | | |
| D-14 | BTC records relating to legal fees incurred in connection with customs issues related to products at issue | | Id. |
| D-15 | BTC records relating to office and warehouse utility expenses | | Id. |
| | | | |
| | | | |